UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TIMOTHY R. JUBACK,

      **Plaintiff,**

vs.                                **Case No. 8:14-cv-00913-T-27EAJ**

MICHAELS STORES, INC.,

      **Defendant.**

_____/

## ORDER

      **BEFORE THE COURT** are Defendant's Motion for Final Summary Judgment (Dkt. 62) and Plaintiff's Motion for Partial Summary Judgment on Counts III, VII, and VIII (Dkt. 63). Each party responded in opposition to the other's motion (Dkts. 87, 88). Upon consideration, Defendant's motion is **GRANTED *in part.*** Plaintiff's motion is **DENIED**. Defendant's motion is **DENIED** as to Plaintiff's claims for unpaid reimbursements, but Plaintiff is **ORDERED TO SHOW CAUSE** why those claims should not be dismissed for lack of federal subject-matter jurisdiction.

      The undisputed facts demonstrate that Defendant terminated Plaintiff for a legitimate, non-discriminatory reason, Defendant did not coerce Plaintiff into not filing a workers' compensation claim, did not interfere with Plaintiff's FMLA rights, and did not discriminate against Plaintiff on the basis of disability.

**I.    BACKGROUND**

      Plaintiff Timothy R. Juback worked for Defendant Michaels Stores, Inc. as a Zone Loss Prevention and Safety Manager ("ZLPM") from September 2008 until October 2013. (Juback Dep.,

Dkt. 64 at 50). Juback's responsibilities included directing the loss prevention and safety efforts of stores in his assigned zone. (Dkt. 64-4). He regularly visited those stores, traveling by car and plane, to oversee their loss prevention and safety programs, train employees, and conduct store audits. (*Id.*; Juback Dep., Dkt. 64 at 75). From the time he was hired until early 2013, Juback's supervisor was Loren Van Roekel, the Director of Store Loss Prevention. (Roberts Dep., Dkt. 75 at 18:2-3). Juback received generally positive evaluations under Van Roekel, including the highest possible rating in his mid-year evaluation in March 2013. (Dkt. 67-5 at p. 9). However, Van Roekel did note problems with Juback's expense reporting and time management. (Dkt. 67-1 at p. 5; Dkt. 67-2 at pp. 5-6; Dkt. 67-3 at p. 6).

John Roberts became Director of Field Loss Prevention and Juback's supervisor in April 2013. (Roberts Dep., Dkt. 75 at 10:16-24). Roberts soon became concerned about Juback's requests for reimbursement of business expenses. On May 24, 2013, Roberts emailed Shawn Gingrich, in Michaels' human resources department, telling him, "I'd like to discuss [Juback's] behavioral trends with you sometime when you have a few minutes." (Dkt. 77-23). On June 3, 2013, Roberts asked for, and received, Juback's expenses for the previous twelve months. (Dkt. 77-26). After reviewing the expenses, Roberts concluded that Juback was improperly claiming business expenses and discussed his concerns with Amanda Gray in Michaels' human resources department and Vice President of Loss Prevention Dan Meyer. (Dkt. 73-2).

On June 19, 2013, Roberts issued, and Juback signed,[1] a "Final Warning" disciplining Juback

---

[1] Juback testified that Roberts told him if he did not sign the warning, he would be fired. (Juback Dep., Dkt. 64 at 98:15-19). The signature block on the warning states, "I have reviewed the document and the contents have been discussed with me. My signature means I have been advised of my performance status and does not necessarily imply that I agree with the evaluation," and also includes a box, "Refusal to Sign," that was not checked. (Dkt. 64-13).

for violations of "Expense Management" and "Failure to follow company programs." (Dkt. 64-13). The warning stated that Juback had "submitted expenses for items outside of Michaels Travel Policy and did not follow company expense reimbursement policy," and listed as examples of ineligible expenses in the action plan "meals in hometown, after travel has concluded" and "[b]ottled water." (*Id.*) The warning stated that "detailed receipts" must be submitted with expense reports. (*Id.*) Juback was directed to reimburse Michaels for a family meal expense on May 17, 2013 and bottled water. The warning concluded that "[f]ailure to improve and sustain performance at any acceptable level may result in further disciplinary action up to and including termination." (*Id.*)

Meanwhile, Roberts became concerned about Juback's involvement in outside business activities, particularly with regard to a nutritional supplement, Zija, which Juback sold while a full-time employee with Michaels. Juback began selling Zija in January 2012. (Juback Dep., Dkt. 64 at 30:24).[2] As an "independent distributor" of Zija, Juback received a commission based on his sales of Zija. (Juback Dep., Dkt. 64 at 26:13-14, 26:21-23, 27:13-28:25). Juback recruited others, including fellow Michaels employees, into his "tree" to sell Zija and received a portion of the commissions they earned. (*Id.* at 31:3-25; Lutz Dep., Dkt. 81 at 66:3-68:10).

Roberts first expressed concerns about Zija to Juback in June 2013. Juback responded that it was a hobby that did not interfere with his work. (Roberts Dep., Dkt. 75 at 84:23-85:3). However, on August 16, 2013, Roberts received an email from Shawn Gingrich, telling him that two District Managers had complained that Juback was sending text messages advertising Zija during company time. (Dkt. 77-5; Gingrich Dep., Dkt. 80-1 at 27:20-36:20). Gingrich wrote that the managers were

---

[2] Juback had asked for and received authorization to sell Zija from Michaels' human resources department. (Juback Dep., Dkt. 64 at 107:7-13). Before Roberts became Juback's supervisor, he asked Juback about Zija and received a sample. (Dkt. 75-12).

"the same ones that called me before and they are getting very frustrated and want it to stop." (Dkt. 77-5). Jeffrey Wallace, a District Manager, testified that Juback frequently sent him text messages promoting Zija during work hours. (Wallace Dep., Dkt. 84-1 at 40-42). Amanda Gray testified that there were additional complaints from Michaels employees about Juback's promotion of Zija, and that some managers believed Juback evaluated them based on their receptiveness to buying and selling Zija. (Gray Dep., Dkt. 71 at 93:5-94:24).[3]

Roberts called Juback on August 30, 2013, while Juback was on vacation, and told him he had spent the day with other company executives discussing Juback's sale and promotion of Zija. (Juback Dep., Dkt. 64 at 100:1-102:18). Roberts told Juback that he would contact him again on September 5, when Juback returned from vacation, to notify him whether Michaels had decided to issue another written warning or terminate him. (*Id.*) Working with human resources, Roberts decided to issue another written warning, because the previous warning did not list Zija as a concern. (Roberts Dep., Dkt. 75 at 58:5-19).

The day the conversation between Roberts and Juback was scheduled to occur, Juback was injured while on the job at a Michaels store in Brandon, Florida. He reported the injury to Roberts and Liz Morales in human resources by email that day, stating his intention to file a workers' compensation claim. (Dkt. 75-5). Juback also notified Roberts and Morales of a prior injury he suffered on February 11, 2013 at a Michaels store in Tampa. (*Id.*)

The February injury occurred in the presence of District Manager Dave Ticich and Loss Prevention Agent Justin Lutz. (Lutz Dep., Dkt. 81 at 28:25-29:18). After the February injury, Juback

---

[3] After Juback was terminated, Roberts investigated the allegation of manipulation of audit scores based on Zija, but found no evidence the audit scores were manipulated. (Roberts II Dep., Dkt. 77 at 95:22-96:5).

exclaimed "ouch" or "that hurt." (*Id.*) Ticich told Juback he "better not report that to Workers'

Comp." (*Id.* at 29:12-30:12, Juback Dep., Dkt. 64 at 186:5-9). Neither Juback nor Ticich reported

the February injury at the time of the incident. (Dkt. 64-5).

After receiving Juback's September 5 email reporting both injuries and requesting workers'

compensation, Roberts forwarded it to Dan Meyer. Meyer replied, "[N]ote company policy for

reporting [workers' compensation] accidents, he needs to be an example in following our processes

instead of not reporting an injury for many weeks." (Dkt. 74-7).

The next day, September 6, 2013, Juback saw a doctor for treatment. (Dkt. 75-12). The

doctor instructed Juback not to travel by plane or car for distances longer than 50 miles. (Dkt. 75-7

at p. 4). While Juback was at the doctor's office, Roberts sent him a electronic invitation for the

discussion regarding Zija and texted Juback to ensure he received the invitation. (Dkt. 75-12). Juback

responded that he received it, and wrote, "I'm still at the doctors office. This is taking forever, I

haven't even been seen yet and I'm in pain :-(." (*Id.*) Roberts replied, "Sorry to hear that. Hope you

feel better soon. Are you at the doctor in Tampa?" (*Id.*) Juback texted back, "Yes. Where did you

think I was?" (*Id.*) Roberts replied, "I'm not in the office so I can't see your calendar. Wasn't sure

if you were traveling today." (*Id.*) Juback responded, "I see." (*Id.*) Juback and Roberts exchanged

further texts about Juback's condition and his diagnosis. (*Id.*)

Later that afternoon, Roberts emailed Juback the draft written warning regarding Juback's

sale and promotion of Zija and called him to discuss it. (Juback Dep., Dkt. 64 at 112:4-114:22; Dkt.

64-17). According to Juback, Roberts was "upset and started yelling" at him during the call, because

Juback disagreed with the written warning. (*Id.*) Roberts insisted that Juback quickly read the

document while Roberts was on the telephone, counting down two minutes for him to read it. (*Id.*)

5

Juback testified that Roberts told him "to shut up or I'm going to fire you now," and when Juback's wife began speaking in the background, Roberts said, "tell her to shut up or . . . I'm going to shut her up." (*Id.*)[4] Juback then told Roberts he was taking pain medication, which led both to conclude that the conversation was inappropriate, and Roberts ended the conversation. (*Id.*; Roberts Dep., Dkt. 75 at 76:14-77:6).

After the call, Roberts wrote to Gray, Meyer, and Jill Marlowe in human resources that Juback had been "very argumentative" during the call and disagreed with the written warning. (Dkt. 72-10). Roberts stated he would continue investigating Juback. (*Id.*) He conducted a Google search of Juback's name and asked another Michaels employee to review security camera footage in an attempt to view Juback's injury. (Dkt. 77-4). Roberts discovered that Juback had recently incorporated a company called LPS Consulting, which focused on risk management and background checks, and had created a website for it. (Dkt. 75-15, Dkt. 75-16).

On September 13, Juback discussed LPS with Matt Robbins, a third-party vendor for Michaels.  Juback told Robbins he was starting LPS and wanted his help, particularly with regard to background checks. (Dkt. 66-2). The conversation made Robbins feel "uncomfortable," and Robbins advised Juback to tell his managers at Michaels about LPS. (*Id.*, Robbins Dep., Dkt. 66 at 46:5-47:25.) After the meeting, Robbins emailed Loren Van Roekel, "I was not comfortable with him even starting this type of relationship while he was an employee of Michaels. I felt like it was a conflict of interest." (*Id.*)

Meanwhile, Juback continued to seek medical attention for his injury. While Juback was

---

[4] Roberts denies he told Juback or his wife to shut up, used profanity, or raised his voice. (Roberts Dep., Dkt. 75 at 76:4-10). Loren Van Roekel, who heard part of the call, testified that Roberts did not raise his voice, that Juback was "excited" and raised his voice, and that Juback's wife was audibly "coaching" Juback on what to say. (Van Roekel Dep., Dkt. 67 at 73:23-76:21).

undergoing a MRI, Roberts told him to book a flight to Dallas three days later for a meeting. (Juback Dep., Dkt. 64 at 116:10-117:4). Juback reminded him of his limitations on flying, but Roberts insisted he book the flight. (*Id.*) Later, Roberts told Juback to cancel the flight. (*Id.* at 176:13-20, Dkt. 75-10, Dkt. 75-12). Based on the MRI, Juback's doctor diagnosed Juback with cervical radiculopathy of the C7 vertebrae and referred him to a spinal surgeon. (Dkt. 75-7). Juback emailed the information that he received from his doctor to Roberts and Morales. (*Id.*) After confirming Juback's travel limitations, Roberts emailed Meyer, Gray, and Marlowe reciting the limitations, indicating he would travel to Florida to meet with Juback and suggesting, "[a]t this time, perhaps we need to advise Tim go out on disability...?" (Dkt. 75-10).[5]

On September 19, Roberts flew to Tampa to meet with Juback to resume the discussion about Zija. Meyer participated in the discussion by telephone. (Juback Dep., Dkt. 64 at 123:1-25). Juback disclosed that approximately ten other Michaels employees were in his Zija tree and acknowledged that he had incorporated LPS. (Dkt. 64-19). On September 30, Roberts emailed Gray, Meyer, and Marlowe, recommending Juback be terminated for violating company policies and poor judgment. Roberts specifically identified the problems of Zija interfering with Juback's work, the effect Zija had on his relationships with other employees, the incorporation of LPS, and the report of Matt Robbins regarding LPS. (Dkt. 72-13 at pp. 1-3). Meyer and Gray agreed with Roberts' recommendation. (Gray Dep., Dkt. 71 at 41:2-43:24).

Four days later, Roberts terminated Juback at a Michaels store in Brandon. (Juback Dep., Dkt. 64 at 135:19-21, 137:13-140:23). Roberts used talking points drafted by Gray, which stated the

---

[5] Roberts and others at Michaels communicated with Juback about the restrictions caused by his injury. (Dkt. 77-7, email from Roberts to Meyer stating that Roberts called Juback to review the restrictions his doctor had placed on him; Dkt. 77-20).

termination was not based on "any 1 infraction," but "about a pattern of judgment calls he's made that impact his perceived objectivity as [ZLPM] and is down-trending in engagement on the job and therefore performance." (Dkt. 75-17). The talking points listed the specific examples of marketing Zija to other employees, approaching an outside vendor to establish a business relationship, and violating the travel expenses policy. (*Id.*)

At the termination meeting, Roberts told Juback to submit all outstanding business expenses. According to Juback, Roberts said he would "make sure" they were paid. (Juback Dep., Dkt. 64 at 214:25-215:5). Juback submitted expenses of $2645.94, of which $477.30 was paid. (Dkt. 64-23). The rest were rejected because they were not submitted within two weeks of being incurred, but were for "previous mileage" for Juback's trips to and from his house to the airport and "previous tips" while traveling. (*Id.*; Juback Dep., Dkt. 64 at 217:11-19).

Juback contends Michaels violated Fla. Stat. § 440.205 by coercing and intimidating him after his injuries in February and September 2013 and by terminating him in retaliation for filing a workers' compensation claim in September 2013 (Counts I, II). He contends Michaels interfered with his Family Medical and Leave Act rights (Count III) and discriminated and retaliated against him in violation of the Americans with Disabilities Act and the Florida Civil Rights Act (Counts VII, VIII). Additionally, he argues Michaels violated Florida law by refusing to pay his outstanding expenses (Counts IV, V, VI).

## II.    STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the

[non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party's evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 249.

The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party. *Id.*

## III.   DISCUSSION

### A.   Counts I and II - Violation of Fla. Stat. § 440.205

Juback contends Michaels violated Fla. Stat. § 440.205 by coercing and intimidating him after he suffered job-related injuries in February and September 2013, and by terminating him in October 2013 in retaliation for filing a workers' compensation claim. Florida courts have interpreted § 440.205 to include two separate claims: retaliatory discharge and retaliatory intimidation or

9

coercion in the absence of a discharge. *See Chase v. Walgreen Co.*, 750 So.2d 93, 97–98 (Fla. 5th DCA 1999).

A § 440.205 claim has the same elements as employment retaliation claims under federal law: (1) the employee engaged in statutorily protected activity, (2) was subjected to an adverse employment action, and (3) there was a causal relationship between the protected activity and the adverse employment action. *See Hornfischer v. Manatee Cnty. Sheriff's Office*, 136 So. 3d 703, 706 (Fla. 2d DCA 2014). Such claims are subject to the burden-shifting framework set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), under which the plaintiff must come forward with a prima facie case. The burden then shifts to the defendant to articulate a non-discriminatory reason for the adverse action, and if that burden is met, the plaintiff must demonstrate that the defendant's reason was pretextual. *See Russell v. KSL Hotel Corp.*, 887 So. 2d 372, 379-380 (Fla. 3d DCA 2004); *Jackson v. Agency for Persons with Disabilities Florida*, 608 Fed. App'x 740, 744 (11th Cir. 2015) (applying *McDonnell Douglas* to § 440.205 retaliatory discharge claim). The plaintiff need not establish that his workers' compensation claim was the only reason for the discharge or prove a specific retaliatory intent on the part of the defendant. *Hornfischer*, 136 So. 3d at 706 (citing *Allan v. SWF Gulf Coast, Inc.*, 535 So. 2d 638, 639 (Fla. 1st DCA 1988)).

### 1.   *Coercion*

Juback contends he was coerced and intimidated in violation of § 440.205 on two occasions, the first of which involves his February 2013 injury. Juback did not, however, make a workers' compensation claim based on that incident. He contends that he did not make a claim because District Manager Dave Ticich, who witnessed the incident, told him at the time "you better not report that to workers' comp." (Lutz Dep., Dkt. 81 at 29:19-30:15).

Juback's second coercion allegation involves his September 2013 injury. After that injury, he expressed an intention to file a workers' compensation claim. The next day, Roberts yelled at him and attempted to contact him while he was seeking medical attention. Based on this, Juback claims this constituted coercion and intimidation in violation of § 440.205.

Notwithstanding his contentions, Juback is unable to make a prima facie case under § 440.205 for either episode, Summary judgment is therefore due to be granted on this claim.

### a.    February 2013 Incident

Section 440.205 of the Florida Statutes prohibits employers from "discharg[ing], threaten[ing] to discharge, intimidat[ing], or coerc[ing] any employee *by reason of such employee's valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law.*" (emphasis added). The undisputed facts demonstrate that Juback never engaged in protected conduct in February 2013.

Although he injured his shoulder in the presence of two Michaels employees and exclaimed "ouch" or "that hurt" at the time (Lutz Dep., Dkt. 81 at 29:7-18), Juback did not report his injury to his supervisor or express any intention to seek workers' compensation at the time, and there is no evidence that he made or attempted to make a workers' compensation claim for that injury. (Juback Dep., Dkt. 64 at 187:23-188:25).[6]

As noted, section 440.205 requires an affirmative "claim" or "attempt" to seek workers' compensation, rather than simply informing an employer of an injury. Fla. Stat. § 440.205; *see Chase*, 750 So. 2d at 94 (plaintiff's filing of several workers' compensation claims is protected

---

[6] Juback argues that Ticich should have reported the injury. Ticich's failure to do so does not implicate § 440.205, which only applies to "attempt[s] to claim compensation" by the affected employee.

activity); *Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So. 2d 182, 184 (Fla. 1983) (Section 440.205 applies to "an employee's pursuit of a workers' compensation claim."); *Scott v. Otis Elevator Co.*, 572 So. 2d 902, 903 (Fla. 1990) ("Section 440.205 reflects the public policy that an employee shall not be discharged for filing or threatening to file a workers' compensation claim."); *Bifulco v. Patient Bus. & Fin. Servs., Inc.*, 39 So. 3d 1255, 1257 (Fla. 2010) ("Section 440.205 . . . creates a cause of action for employees who are subject to retaliatory treatment by their employers for attempting to claim workers' compensation."); *Silvers v. Timothy J. O'Donnell Corp.*, 751 So. 2d 747, 748 (Fla. 5th DCA 2000) (plaintiff was "applying for workers compensation" when terminated).

No published case in Florida has held that a § 440.205 claim is viable in the absence of the filing of a workers' compensation claim or an affirmative attempt or threat to do so. *See Villavicencio v. Siemens Power Transmission, & Distribution, Inc.*, 867 So. 2d 628, 628 (Fla. 3d DCA 2004) (affirming summary judgment on § 440.205 claim because "the plaintiff made neither a valid claim for compensation or attempt to claim compensation under the Workers' Compensation Law") (internal quotation omitted). And federal district courts have interpreted the protected activity requirement of § 440.205 as requiring an affirmative attempt to seek workers' compensation. *See Leon v. Tapas & Tintos, Inc.*, 51 F. Supp. 3d 1290, 1295 n.1 (S.D. Fla. 2014) (informing employer of accident, without more, is not protected conduct); *Noboa v. Sygma Network, Inc.*, No. 6:10-cv-1753-Orl-36DAB, 2012 WL 1438833, at *4-5 (M.D. Fla. Apr. 25, 2012) (plaintiff attempted to claim compensation, satisfying requirement of protected activity, when plaintiff completed injury forms and was driven by supervisors to clinic for treatment); *Stallworth v. Okaloosa County School Dist.*, No. 3:09-cv-404, 2011 WL 4552187, at *12 (N.D. Fla. Sept. 30, 2011) (plaintiff filed workers'

compensation claim, fulfilling protected activity requirement).[7]

In an attempt to sidestep his inability to satisfy this protected activity requirement, Juback contends that he did not file a workers' compensation claim after the February injury because he was afraid of retaliation from Ticich, who told Juback that he "better not report that to workers' comp." (Juback Dep., Dkt. 64 at 187:23-188:14; Lutz Dep., Dkt. 81 at 30:7-12). Juback's fear does not excuse the statutory requirement of an affirmative attempt to seek workers' compensation, and he cites no authority supporting his contention.

For example, a retaliation claim fails if the plaintiff did not engage in protected activity, regardless of any adverse employment action taken against him.[8] *Smith*, 427 So. 2d at 184 (protected activity is required element of § 440.205 prima facie case). *Cf. Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010) (even though plaintiff suffered adverse action of termination, his Title VII retaliation claim failed "as a matter of law . . . because he did not engage in protected conduct."). And the requirement that a plaintiff demonstrate a causal connection between protected activity and an adverse employment action necessarily requires that the protected activity occur prior to the adverse employment action. *Russell v. KSL Hotel Corp.*, 887 So. 2d 372, 379 (Fla. 3d DCA 2004)

---

[7] Even if informing an employer was sufficient to satisfy the protected activity requirement, Juback provides no authority that exclaiming "ouch" or "that hurt," without more, adequately informs an employer.

[8] It is not clear that Ticich, as a District Manager, could have initiated an adverse employment action against Juback. The undisputed facts demonstrate that Juback, as a ZLPM, outranked District Managers, at least in the context of workers' compensation issues. Dan Meyer testified that "Tim is responsible for the process of how we do this [workers' compensation policy] for the zone which includes a district manager and a store manager, so he shouldn't be taking direction from a store manager or a district manager." (Meyer II Dep., Dkt. 74 at 72:3-12), and ZLPMs were responsible for evaluating whether District Managers were complying with company policies. (Sauser Dep., Dkt. 70 at 23:25:24:3 ("Q: In your filling out the tour form, who essentially are [ZLPMs] reviewing? Is it the Store Manager or the District Manager who receives these reports? A: The District Manager receives the reports."); Dkt. 67-1 at p. 5 ("Tim must understand that the DM's do not work for him so if Tim needs to have them work on certain issues he need[s] to make sure he is asking them and not telling them what to do."). Regardless, the question of whether Ticich's comment to Juback constituted an adverse employment action need not be reached.

("In order to satisfy the causal connection prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.") (internal quotation omitted).

Since Juback did not engage in protected activity in February 2013, his coercion claim, to the extent it is based on that event, fails. *See Villavicencio*, 867 So. 2d at 628; *Leon*, 51 F. Supp. 3d at 1295.[9]

### b.    September 2013 Incident

Juback did engage in protected activity after his injury in September 2013. That day, Juback emailed his supervisor, John Roberts, and Liz Morales, reporting the injury and expressing his intention to make a workers' compensation claim. (*See* Dkt. 75-5). The next day, according to Juback, Roberts yelled at him and attempted to contact him while he was seeking medical attention. Notwithstanding, Juback cannot demonstrate a prima facie case of coercion, because yelling at an employee does not constitute an adverse employment action.[10]

To demonstrate that a challenged employment action was "materially adverse," a plaintiff must show "it well might have dissuaded a reasonable worker from [engaging in protected activity]." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). For example, it has been held that a 37-day suspension without pay, reassignment of a worker to a new position with less prestige and responsibility, and negative performance reviews linked to a denial of a merit pay increase constitute adverse employment actions. *Id.* at 70, 72; *Holland v. Gee*, 677 F.3d 1047, 1058

---

[9] Because Juback did not affirmatively attempt to make a workers' compensation claim as a result of the February 2013 injury, any factual dispute concerning whether Ticich was joking when he told Juback that he "better not report that to workers' comp" is not material, and therefore does not preclude summary judgment.

[10] Whether Roberts yelled at Juback is disputed, but the facts are taken in a light most favorable to Juback for purposes of summary judgment,

14

(11th Cir. 2012); *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008).

However, "trivial harms" and "petty slights," *Burlington Northern*, 548 U.S. at 68, such as a supervisor's "oral . . . criticisms," unconnected to any "tangible job consequences," do not constitute an adverse employment action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1241 (11th Cir. 2001); *see Givens v. Chambers*, 548 F. Supp. 2d 1259, 1271 (M.D. Ala. 2008) ("courts have concluded a supervisor's public and loud verbal criticisms are insufficient to satisfy the adverse employment action requirement.").

Here, Roberts' conduct can be characterized as nothing more than oral criticism. Even considering the timing of his conduct, Juback has not demonstrated that the yelling was connected to any tangible job consequence. Accordingly, Juback has not demonstrated that he suffered an adverse employment action as a result of Roberts yelling at him or attempting to contact him. Summary judgment will therefore be granted in favor of Michaels on the coercion claim.

### 2.      *Retaliatory Discharge*

Juback's retaliatory discharge claim is based on his discipline and termination in September-October 2013. Michaels does not contest that Juback engaged in protected activity (requesting workers' compensation as a result of the September 2013 injury) or that he suffered an adverse employment action (his discipline and termination less than one month later). Michaels argues, however, that Juback cannot demonstrate a causal connection between the protected activity and the adverse employment action, and that it had legitimate, non-discriminatory reasons for disciplining him and terminating his employment. The Court agrees.

### a.      **Causal Connection**

Juback is unable to demonstrate a causal connection between the protected activity and an

adverse employment action, that is, his expressed intent to file a workers' compensation claim and his ultimate discharge. He relies on temporal proximity. However, "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006).

It is undisputed that Roberts was contemplating Juback's termination before Juback reported his injury, because of Juback's promotion and sale of Zija while at work.  (Juback Dep., Dkt. 64 at 101:15-102:18 (in phone conversation on August 30, 2013, Roberts told Juback he was considering whether to terminate him or discipline him)). And as discussed below, Juback's ultimate termination was based, in part, on his sale and promotion of Zija.

Because Juback offers no evidence, other than temporal proximity, to support a causal connection between his expressed intention to pursue a workers' compensation claim and his termination, and Roberts was considering terminating Juback before he reported his injury, summary judgment is due to be granted on his retaliatory discharge claim. *See Drago*, 453 F.3d at 1308 (affirming grant of summary judgment on FMLA retaliation claim because adverse employment action was considered five months before employee took FMLA leave).

### b.    Pretext

Even if Juback could make a prima facie case of retaliatory discharge, he is required to come forward with sufficient evidence for a jury to conclude that Michaels' stated reasons for his termination were pretextual. Michaels contends that it terminated Juback for violation of its outside engagement and travel expense policies and for poor performance. (*See* Dkt. 75-17 (email from Amanda Gray to John Roberts regarding Juback termination)).

To establish Michaels' stated reasons were pretextual, Juback must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). These weaknesses must be in the "form of specific facts" that demonstrate Michaels' reasons were pretextual, *Wilcox v. Corr. Corp. of Am.*, 2015 U.S. App. LEXIS 3768, at * 11 (11th Cir. Mar. 11, 2015) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)), and Juback bears the burden of producing "significant probative evidence on the issue to avoid summary judgment." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376-77 (11th Cir. 1996) (internal quotation and citation omitted). And rather than simply showing that the application of Michaels' policy was unfair or mistaken, Juback must demonstrate that Michaels did not truly rely on the proffered non-discriminatory reasons. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct.").

The inquiry on pretext centers on the employer's "good faith belief," not the employee's interpretation of the events. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000). Because "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions," a plaintiff may not establish pretext merely by quarreling with the wisdom of an employer's decision. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (internal quotation marks and alteration omitted). An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for

17

a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).

Juback contends that Michaels' reasons for his termination were pretextual because (1) the reasons were not credible, (2) other employees who engaged in similar behavior were treated less harshly, and (3) Roberts and others at Michaels displayed retaliatory animus toward Juback. Notwithstanding, Juback has not met his burden of producing sufficient evidence from which a jury could find that Michaels' stated reasons were pretextual. Accordingly, summary judgment is due to be granted on Juback's retaliatory discharge claim.

First, Juback argues that Michaels' reasons for his termination, including his sale and promotion of Zija, his LPS Consulting business, and his discussion regarding LPS and background checks with Matt Robbins, the third-party vendor for Michaels, were not credible. Regarding Zija, Juback argues that he had permission to sell the product from Michaels' human resources department, that Roberts knew about his involvement with Zija before becoming his supervisor, and that his sale of Zija did not affect his work performance. While it is undisputed that Juback had been granted permission to sell Zija and that Roberts was aware of his involvement with Zija, that does do not undermine the legitimate reasons for his termination.

*After* Juback was granted permission to sell Zija and Roberts tried it, Michaels developed a good faith belief that Juback's promotion and sale of Zija affected his performance and his relationships with other employees. Indeed, it was widely believed within the company that Juback's involvement with Zija was interfering with his effectiveness. (*See* Dkt. 77-5 and Gingrich Dep., Dkt. 80-1 at 27:20-36:20 (email from Shawn Gingrich to Roberts stating that he received calls from two district managers complaining that Juback was sending text messages promoting Zija during a

Michaels meeting, and supporting testimony); Dkt. 75-24 (Juback written warning stating, "The selling of other products has impacted Tim's reputation within Michaels. The DMs and store managers . . . feel obligated to buy Tim's product or face the chance of getting a bad score on a LP visit."); Gray Dep., Dkt. 71 at 94:2-95:23 (same); Wallace Dep., Dkt. 84-1 at 40-41 (testimony that Juback was engaged in communications promoting Zija during work); Dkt. 64-19 (Juback disclosure form admitting "approx. 10+ Michaels associates at various levels" were in his Zija tree)).

Juback unsuccessfully attempts to rebut the information on which Michaels relied. First, Juback mistakenly contends the Gingrich email is inadmissible hearsay. The email is not offered to prove the truth of the matter asserted, but rather for its effect on the recipient, Roberts. *See* Fed. R. Evid. 801(c)(1). The Gingrich email bolsters Michaels' claim that it had a good faith basis to believe that Juback's promotion and sale of Zija was interfering with his performance.

Similarly, while Michaels never discovered any evidence that Juback was manipulating scores for managers based on their willingness to buy and sell Zija (Roberts II Dep., Dkt. 77 at 95:22-96:5), Michaels was entitled to take action based on the perception of its employees that Juback was biased, even if the information it received ultimately proved to be incorrect. *See Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) ("[F]or an employer to prevail the . . . employer [need not be] correct in its assessment of the employee's performance; . . . it need only [act] in good faith [and] believe[] plaintiff's performance to be unsatisfactory. . . .").

Nor can Juback show that Michaels' reliance on his formation of LPS Consulting and his meeting with Robbins as a reason for terminating him was pretextual. It is undisputed that Juback incorporated LPS while under investigation by Michaels for his outside business interests. (Dkt. 75-15 (LPS website and Twitter account); Dkt. 75-16 (LPS Articles of Incorporation filed August 15,

19

2013)). And it is also undisputed that Juback's statements to Robbins made him sufficiently

"uncomfortable" that he contacted Michaels to express his concerns about "a conflict of interest."

(Robbins Dep., Dkt. 66 at 46:5-47:25; Dkt. 66-2).[11] These undisputed events would certainly raise

legitimate concerns on the part of any employer about an employee's commitment, job performance

and loyalty.

In sum, Juback fails to demonstrate that his employer's stated reasons for his termination

were pretextual. *See Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1324 n.16 (11th

Cir. 1988) ("There may have been a misunderstanding. [One or both of the parties] may have been

mistaken or lied. But federal courts do not sit to review the accuracy of the employer's fact findings

or of the employer's decision to terminate a plaintiff's employment.").

Next, Juback attempts to show that other Michaels employees were treated less harshly for

similar conduct. A plaintiff can demonstrate a "proffered reason for termination is . . . 'arguably

pretextual' when [he] can submit evidence that . . . 'other employees outside the protected class, who

engaged in similar acts, were not similarly treated.'" *Jackson*, 608 Fed. App'x at 742 (quoting

*Damon*, 196 F.3d at 1363). Juback bears the burden of demonstrating that the "other employees"

were "similarly situated in all relevant respects" and "were engaged in nearly identical conduct and

yet were treated more favorably." *Jackson*, 608 Fed. App'x at 742 (quoting *Knight v. Baptist Hosp.*

*of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (further quotation omitted) and citing

*Burke–Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 & n.2 (11th Cir. 2006) (internal quotation

omitted)).

---

[11] Juback's contention that other Michaels employees socialized with Robbins misses the mark, as Juback has not shown that Robbins perceived any of these other encounters to be "uncomfortable" or a "conflict of interest."

As examples of other employees with outside business interests, Juback identifies ZLPM Jon Sauser, who owned a custom t-shirt company that competed with Michaels, District Manager Jeff Wallace, who provided consulting services for a third party about the arts and crafts industry (Michaels' core business), and several other Michaels employees who distributed Zija. He contends that unlike him, none of these employees were terminated because of their outside business interests.

These examples do not, however, cast doubt on Michaels' stated reasons for Juback's termination, because these employees are not shown to be "similarly situated in all relevant respects" or "engaged in nearly identical conduct." Juback was terminated not solely because of his involvement with Zija, but also because of his formation of LPS and his conversation with Robbins, all of which in Michaels' view detracted from his performance and commitment to Michaels..[12] Juback presents no evidence that the outside business interests of Sauser, Wallace, or the other employees' involvement with Zija affected their job performance or that Michaels had concerns about their performance and commitment because of those interests. *See Jackson*, 608 Fed. App'x at 744 (affirming summary judgment because employee failed to show other employees treated less harshly had similar "disciplinary history.").

Finally, Juback contends that Roberts and others exhibited a retaliatory animus toward him. Juback points to the investigation Roberts conducted after Juback's second injury, which included a Google search of Juback's name and examining security camera footage in an attempt to find an image of the September injury. (Dkt. 77-4). This contention is unpersuasive.

Roberts had been investigating complaints about Juback's performance and commitment for

---

[12] Further, Wallace's direct supervisor was not Roberts, and "differences in treatment by different supervisors or decision makers can seldom be the basis" for finding a proffered reason was pretextual. *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001).

several months (Dkt. 77-23 (Roberts email to Shawn Gingrich regarding Juback's "behavioral

trends" in May 2013); Dkt. 77-27 (Roberts inquiry about expenses submitted by Juback in June

2013); Dkt. 64-15 (Final Warning issued to Juback by Roberts based on "Expense Management" and

"Failure to follow company programs" on June 17, 2013)). He was understandably wary when

Juback claimed to be injured the day his final warning meeting was scheduled. (Roberts Dep., Dkt.

75 at 39-42). While Roberts' investigation may be evidence that he wanted to terminate Juback, it

is not evidence that he or anyone else wanted to terminate Juback *because* he reported a workers'

compensation claim.[13] *See Silvestri v. Jupiter Inlet Colony, Fla.*, No. 14-15077, 2015 WL 3619652

(11th Cir. 2015) ("[T]o prove that a reason is a pretext for discrimination, the employee must show

that the employer's asserted reason is false, and that discrimination was the real reason."); *Flowers

v. Troup Cnty., Ga., Sch. Dist.*, No. 14-11498, 2015 WL 6081186, at *8 (11th Cir. 2015).[14] Since

Juback "simply quarrel[s] with the wisdom of [his termination]" and cannot "rebut it," summary

judgment will be granted on the retaliatory discharge claim in favor of Michaels. *Chapman*, 229 F.3d

---

[13] Juback also points to an email by Dan Meyer, which states, "[N]ote company policy for reporting [workers' compensation] accidents, he needs to be an example in following our processes instead of not reporting an injury for many weeks." (Dkt. 74-7 (email from Meyer to Roberts)). This email does not support Juback's contention of retaliatory intent, because it shows Meyer was frustrated by Juback's delay in reporting his February injury, not that Meyer or anyone else at Michaels intended to retaliate against Juback for reporting his September injury.

[14] Juback cites *Hornfischer*, 136 So. 3d at 708-09, to support his theory of retaliatory intent, but the facts of that case are distinguishable. In *Hornfischer*, the Florida Second District Court of Appeal reversed a summary judgment in favor of the employer on a § 440.205 retaliatory discharge claim, in part because the record contained evidence that the employer's agents sent "a series of e-mails [which] constantly displayed a negative attitude toward Mr. Hornfischer and his workers' compensation claims," conducted surveillance of the plaintiff, arranged for an off-duty policy officer to be present at the plaintiff's deposition, and referred the plaintiff's case to the state for investigation of insurance fraud. *Id.* By contrast, Juback has not presented any credible evidence of a "negative attitude" toward his workers' compensation claims, and unlike the plaintiff in *Hornfischer*, cannot show that the proffered reasons for his termination "are subject to question." *Id.* at 707.

at 1030.[15]

### B.      Count III - FMLA Interference

Juback contends that Michaels violated the FMLA by failing to provide him notice of his

rights under the statute and by terminating him. Michaels moves for summary judgment on this

claim, contending that Juback cannot show that he was denied a FMLA benefit and that his

termination was not related to the FMLA.

The FMLA creates two distinct claims: interference claims, in which an employee asserts that

his employer denied or otherwise interfered with his substantive rights under the FMLA, and

retaliation claims, in which an employee asserts that his employer discriminated against him because

he engaged in activity protected by the FMLA. *Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666

F.3d 1269, 1274 (11th Cir. 2012); *see* 29 U.S.C. § 2615(a). Juback asserts an interference claim.

Employers are prohibited from "interfering with, restraining, or denying the exercise of (or

attempts to exercise) any rights" protected by the FMLA. 29 C.F.R. § 825.220(a)(1); 29 U.S.C. §

---

[15] Juback states on several occasions in his brief that Michaels had knowledge of the stated reasons for his termination before he engaged in the protected activity of reporting his workers' compensation claim. However, he fails to explain why this is legally or logically significant. Indeed an employer's prior knowledge of the ultimate reasons for termination favors a finding that the employer's reasons were not pretextual. *See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) (affirming summary judgment on employment retaliation claim because, among other things, employer had considered adverse employment action *before* employee engaged in protected activity).

The undisputed facts demonstrate that before he was notified of the September 2013 injury, Roberts was investigating Juback's actions, particularly his involvement with Zija, and told Juback that a decision would be reached on whether to terminate him or issue a second written warning when he returned from vacation. (Juback Dep., Dkt. 64 at 101:15-102:18). Michaels decided to issue Juback another written warning but before they were able to do so, Juback was injured and made his workers' compensation claim. (*Id.*; Dkt. 75-5 (Juback email reporting injury on September 6, 2013)). Further, between the time Juback notified Michaels of his workers' compensation claim and his termination, Michaels discovered new information regarding his outside business activities, including that Juback had formed LPS Consulting, Juback had discussed LPS with Robbins, and Juback had recruited ten Michaels employees into his Zija "tree." In sum, Michaels decided to terminate Juback based on facts it learned before *and* after he engaged in protected activity. Nothing about the sequence of events undermines the legitimacy of the proffered reasons for his termination. *See Cotton*, 434 F.3d at 1232.

2615(a). Interference includes refusing to authorize FMLA leave, discouraging the use of FMLA leave, manipulation to avoid responsibilities under the FMLA, and changing the essential functions of a job in order to preclude the taking of leave. 29 C.F.R. § 825.220(b).

To state a prima facie interference claim, Juback must demonstrate (1) he was entitled to a benefit under the FMLA, and (2) he was denied that benefit by Michaels. *White v. Beltram Edge Tool Supply*, 789 F.3d 1188, 1190 (11th Cir. 2015); *Pereda,* 666 F.3d at 1274. Further, he must demonstrate that the denial of the benefit harmed him. *See Demers v. Adams Homes of Northwest Florida, Inc.*, 321 Fed. App'x 847, 849 (11th Cir. 2009) (employer entitled to summary judgment on interference claim where employee "cannot articulate any harm suffered from [the] denial" of FMLA leave) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). "[E]ven where there may have been technical violations of the FMLA," those are not "compensable" unless the employee can demonstrate prejudice under the statute. *Drago*, 453 F.3d at 1307.

Juback contends that he was entitled to FMLA leave and that Michaels failed to provide him notice of the availability of FMLA leave.[16] Even if Juback could show that he was entitled to FMLA leave and did not receive notice of its availability from Michaels, the undisputed facts demonstrate that Juback received all the medical leave he requested. (*See* Juback Dep., Dkt. 64 at 200:25-201:18 (Juback received paid sick leave for doctors' appointments, cannot identify other leave he requested); 208:20-24 ("Q: At no point did you make any request for FMLA leave; correct? A: No."); 176:13-20 (after Juback told Roberts he could not fly to Dallas, he did not fly)). "[A] plaintiff suffers no FMLA injury when [he] receives all the leave [he] requests, and indeed is paid for most of it." *Graham v.*

---

[16] Michaels argues that Juback has not shown that he suffered from a "serious health condition" requiring "continuing treatment by a health care provider," a requirement for FMLA eligibility. 29 U.S.C. § 2611(11); 29 C.F.R. § 825.115. However, there is a dispute of material fact about whether Juback's spine condition qualified as a "chronic serious health condition," which may have entitled him to FMLA protection. *See* 29 C.F.R. § 825.115(c).

*State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1275 (11th Cir. 1999).

Juback is therefore unable to show any harm based on his claim of lack of notice of the availability of FMLA leave. *See id.* at 1284 (affirming summary judgment against employee who was erroneously told she did not qualify for FMLA leave but who nevertheless was given equivalent leave); *Lowery v. Strength*, 356 Fed. App'x 332, 334 (11th Cir. 2009) (affirming grant of summary judgment because employee "presented no evidence that [her employer] knew she was seeking FMLA leave, much less that [the employer] somehow sought to discourage her from using FMLA leave.").[17]

Juback also contends that his ultimate termination was related to the FMLA. To state a FMLA interference claim based on termination, the employee's "request for leave must have been the proximate cause of the termination. If the evidence shows that a decisionmaker was unaware of an employee's request to take FMLA leave at the time of the decision to terminate the employee, the employer is entitled to summary judgment." *Rudy v. Walker Coke, Inc.*, No. 14-12703, 2015 WL 3461233, at *1 (11th Cir. June 2, 2015).

Because Juback had not requested FMLA leave at the time of his termination (Juback Dep., Dkt. 64 at 208:20-24), the claimed interference with his FMLA rights could not have been the proximate cause of his termination. Further, his termination was based largely on conduct that occurred before Juback's September injury, and a FMLA interference claim fails if the employee was going to be terminated for other reasons. *See Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236

---

[17] Juback also contends that Roberts harassed him while he was attempting to seek care for his injuries on September 6, 2013. The undisputed facts, however, show simply that Roberts attempted to contact him about the written warning concerning Juback's sale and promotion of Zija, a discussion which had been scheduled before Juback suffered his injury. (Dkt. 75-12). Juback provides no authority that supports the theory that attempts by an employer to contact an employee for a previously scheduled meeting, or that a harsh tone by the employer when communication was established, interferes with the FMLA rights of the employee.

(11th Cir. 2010) ("the right to commence FMLA leave is not absolute, and [] an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave."). Michaels is therefore entitled to summary judgment on Juback's FMLA interference claim.

## C.   Counts VII and VIII - Violations of ADA and FCRA

Juback asserts discrimination and retaliation claims[18] under the ADA and FCRA.[19] He contends Michaels violated the ADA when it denied him reasonable accommodations, failed to engage in the interactive process to accommodate his disability, and ultimately terminated him. Notwithstanding, the undisputed facts demonstrate that Michaels provided Juback all requested accommodations, communicated with him about his limitations, and terminated him for legitimate, non-pretextual reasons unrelated to his claimed disability.

### 1.   *Reasonable Accommodation and Interactive Process Claims*

To establish a prima facie case of employment discrimination under the ADA, Juback must demonstrate that: (1) he has a disability; (2) he is a qualified individual with or without a reasonable accommodation; and (3) he was unlawfully discriminated against because of the disability. *Rossbach v. City of Miami*, 371 F.3d 1354, 1356-1357 (11th Cir. 2004).[20] The *McDonnell Douglas* burden-

---

[18] The parties interpreted Count VII of the Second Amended Complaint to state claims for both discrimination and retaliation, although it is not clear that retaliation is included in Count VII. At the least, Count VII improperly lumps discrimination and retaliation together.

[19] The FCRA is interpreted as coextensive with the ADA. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1224 n. 2 (11th Cir. 2005).

[20] Michaels argues that Juback was not disabled, but there is sufficient evidence in the record from which a jury could conclude that Michaels regarded Juback as disabled. (Dkt. 75-10, email from Roberts to Meyer, Gray, and Marlowe, referencing Juback's injury and subsequent "travel restrictions" and stating "[a]t this time, perhaps we need to advise Tim to go out on disability[]?"). *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002) (holding that "a plaintiff may maintain a claim under the ADA of being perceived as disabled without proof of actually being disabled.").

shifting framework is inapplicable to reasonable accommodation claims, so he must only establish that he was a qualified individual with a disability and was denied a reasonable accommodation. *Nadler v. Harvey,* No. 06-12692, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007).

The employee bears the burden of showing reasonable accommodations were available, *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996), and the employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). The employee is "not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997) (internal quotation omitted). An employer's failure to communicate with an employee about his limitations does not relieve the employee of the burden of demonstrating that a reasonable accommodation was available. *McKane v. UBS Fin. Servs., Inc.*, 363 Fed. App'x 679, 682 (11th Cir. 2010).

Juback fails to establish that he asked for any specific accommodations that were denied or even questioned by Michaels. And it is undisputed that he received all of the accommodations he did request. (Juback Dep., Dkt. 64 at 176:13-16; Dkt. 75-12 (text message from Juback to Roberts stating he canceled his flight to Dallas)). Juback testified that Roberts initially asked him to fly to Dallas despite his doctor's orders to avoid flights, but that is of no legal significance because as Juback admits, Roberts eventually acquiesced and told Juback not to fly. (*Id.*)

As for the interactive process, the undisputed facts show that Juback was continually in contact with Michaels about the extent of his injuries and any resulting limitations. (Dkt. 77-7 (email from Roberts to Dan Meyer explaining how Roberts called Juback to "review his Return to Work

27

restrictions"); Dkt. 77-20 (email from Catherine Radock to Juback asking about his work status after injury)). Moreover, any infirmity in the interactive process would be inconsequential because Juback has not demonstrated that he requested any accommodation which was denied. *McKane*, 363 Fed. App'x at 682.

Since Michaels communicated with Juback about his limitations and he received all of the accommodations Juback requested, summary judgment is due to be granted on his reasonable accommodation and interactive process claims. *See Stewart*, 117 F.3d at 1287 (granting summary judgment on on ADA discrimination claim based on reasonable accommodation and interactive process theories because "[l]iability simply cannot arise under the ADA when an employer does not obstruct an informal interactive process [and] makes reasonable efforts to communicate with the employee and provide accommodations based on the information it possesses . . . .").

## 2.    *Termination Claims*

Juback also contends that Michaels terminated him because of his disability, violating the discrimination and retaliation prohibitions of the ADA. These claims are subject to the *McDonnell Douglas* burden-shifting framework, which requires Juback to make a prima facie case of discrimination or retaliation and rebut any legitimate, non-discriminatory reasons for his termination articulated by Michaels. *Wascura v. City of South Miami*, 257 F.3d 1238, 1242-43 (11th Cir. 2001); *Williams*, 303 F.3d at 1291. Even assuming that Juback could make a prima facie case, these claims fail, because as discussed, Michaels articulated legitimate, non-discriminatory reasons for his termination, which Juback has not shown to have been pretextual. *See* Part III.A.2.[21]

---

[21] Additionally, Juback cannot show a causal connection between his protected activity and his termination, as he has no direct evidence of discrimination and temporal proximity alone does not suffice to demonstrate a causal connection where an employer, as Michaels did here, "contemplates an adverse employment action before an employee engages in protected activity." *Drago*, 453 F.3d at 1308.

### D.     Plaintiff's Motion

Because Michaels is due to be granted summary judgment on the counts addressed by Juback's motion for partial summary judgment, Juback's motion for partial summary judgment is effectively rendered moot.

### E.     Counts IV, V, VI - Unpaid Reimbursements

Juback contends that Michaels failed to reimburse him $2,168.64 for "previous mileage" and "previous tips" expenses he incurred before his termination. He claims that he is entitled to the $2,168.64 based on theories of common law unpaid wages, promissory estoppel, and unjust enrichment. Michaels counters that it is entitled to summary judgment because the expenses do not comply with its expense reimbursement policy. While Juback does not dispute that the expenses were untimely submitted (Juback Dep., Dkt. 64 at 217:11-19), he contends that Roberts promised that the expenses would be paid regardless. (*Id*. at 214:25-215:5, 215:19-216:1).

Unpaid wage claims based on Florida common law need not be pled as breach of contract claims, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1271 (11th Cir. 2009) ("[W]e see no indication in Florida law that an unpaid wages claim, in and of itself, is necessarily the equivalent of a breach of contract claim."), and Juback's other theories of recovery are based on quasi-contract principles. *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 924 (Fla. 1989) (promissory estoppel); *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.*, 43 So. 3d 877, 880 (Fla. 1st DCA 2010) (unjust enrichment). The language of the policy therefore does not necessarily control, and Juback's testimony is sufficient to create a genuine dispute of material fact with regard to whether Roberts promised the late-filed expenses would be paid.

### IV.     CONCLUSION

29

Defendant's Motion for Final Summary Judgment (Dkt. 62) is **GRANTED** as to Counts I, II, III, VII, and VIII, and **DENIED** as to Counts IV, V, and VI.

Plaintiff's Motion for Partial Summary Judgment on Counts III, VII, and VIII (Dkt. 63) is **DENIED**.

Plaintiff's Motion to Strike Rebuttal Expert Reports and Exclude Rebuttal Expert Testimony (Dkt. 91) is **DENIED** *as moot*.

Federal subject-matter jurisdiction was invoked based on federal question jurisdiction and diversity of citizenship (Dkt. 19 ¶ 1). As all federal claims have been disposed of and the remaining amount in controversy appears to be less than $2,200, Plaintiff is **ORDERED TO SHOW CAUSE** within 14 days why his remaining claims should not be dismissed without prejudice for lack of federal subject-matter jurisdiction. Defendant may respond to Plaintiff's submission within 7 days of its filing.

**DONE AND ORDERED** this ___9___$^{\text{th}}$ day of November, 2015.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to: Counsel of Record

30